**Derek Ian HILLA, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 01–91–00101–CR.**

Court of Appeals of Texas,
Houston (1st Dist.).

June 18, 1992.

Discretionary Review Refused
Sept. 30, 1992.

Ronnie G. Harrison, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., Karen A. Clark, Carol Davies, Asst. Dist. Attys., Houston, for appellee.

Before OLIVER–PARROTT, C.J., and MIRABAL and PRICE,[1] JJ.

## OPINION

PRICE, Justice (Assigned).

A jury found appellant, Derek Ian Hilla, guilty of murder as charged in the indictment, and further found that he used or exhibited a deadly weapon, his foot. The jury assessed punishment at 45–years confinement and a $10,000 fine.

On the evening of August 8, 1990, a group of teenagers, including appellant, co-defendant Kevin Allison, Christopher Miels, Rob Lyne, and Jesse Neff, were "hanging out" and drinking at the home of Paul Bobbit on Carolcrest while Bobbit's parents were absent. Miels characterized himself, appellant, Allison, and Neff as "skinheads," stating that a skinhead was someone who had "racist" beliefs or pride in his own race. Appellant and Allison were both at least six feet tall; they were 18 years old.

When a member of the group returned to the house in the early morning hours of August 9, stating that he had been beaten up by four men in a red Mustang, six members of the group decided to go looking for the assailants. Miels, Neff, appellant, and Allison got into Allison's car. They were followed by Lyne and another

---

1. The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, sitting by assignment.

member of the group in a second car. It was between two and three in the morning.

Within a few blocks of the Bobbit house, the group in the cars met a group of six teenagers walking across the street. One of those walking was the complainant, Hung Truong, who was 15 years old and approximately five foot six inches tall and weighed about 120 pounds. Several of the walkers knew Lyne. There was an altercation. After some minutes, the walkers headed for the Ashford on Memorial apartments across the street; the second car went back to Bobbit's house; and the four in Allison's car followed the walkers to the apartments.

At the apartments, appellant, Allison, and Neff singled out the complainant and began talking to him. The complainant started to run and was chased by appellant, Allison, and Neff. The complainant's friends started screaming for help, rousing some of the inhabitants of the apartments and townhomes across the street.

Miels followed the runners in Allison's car. Neff fell behind and went back to the car. Allison and appellant caught the complainant and beat him. Allison and appellant then returned to the car, and they started back to Bobbit's house.

Paramedics were called, arrived, and treated the complainant who refused to go to the hospital. The complainant was able to walk around, and went to the home of a friend where his condition deteriorated. Friends called the paramedics again; the complainant was taken to the hospital where he died before 9:45 a.m. on August 9.

In his first point of error, appellant asserts the trial court committed reversible error by refusing to permit him to ask a proper question of a prospective juror on voir dire.

The venire consisted of 70 people. When the judge began the voir dire, he told the venire the charge was murder and explained that the range of punishment for murder: on the low end, five to ten years probation; on the high end 99 years or life confinement. He reminded them they had to keep an open mind on punishment, including as little as five-years probation. He asked them if anyone would automatically exclude from consideration before hearing any testimony the lower range of punishment or the upper ranger of punishment. From their silence, he concluded the answer was no.

The judge then proceeded to discuss the media, telling the venire that they must base their verdict on what they heard in the courtroom, not on what they heard on local news broadcasts or read in the newspapers. He asked who had heard or seen anything about an August 1990 incident in which a Vietnamese teenager died after having been allegedly beaten by persons described as skinheads. Fifty-two members of the venire raised their hands.[2] The court and the attorneys interviewed individually those who raised their hands and responded "yes" to question 10 on the questionnaire.

When prospective juror West[3] approached the bench, the defense attempted to ask the following:

DEFENSE COUNSEL: I haven't finished the question. Based on the publicity that you have read, sir, is your mind open to the possibility of a sentence of five years probation if the defendants are guilty of an offense?

The court refused to allow the question, stating that the defense was trying to commit the juror to a range of punishment based on a specific set of facts. After further discussion outside the presence of the venire, the court overruled the defense objections, and refused to allow any ques-

2. At this time, questionnaires were handed out to all members of the venire. Question 10 asked: "Have you heard or seen anything about an August 1990 incident in which a Vietnamese teenager died after having allegedly been beaten by persons described as 'skinheads' in West Houston? Yes ( ) No ( ) If Yes, please explain what you have heard or seen, and how or where you got the information (conversation with others, newspapers, radio, television, etc.)."

3. West did not serve on the jury. He was struck by the State, but not by the defense.

tions linking the lower range of punishment, probation, to the publicity about the case a venire member might have read or heard. However, the judge did ask each venire member questioned after West whether he or she could keep on open mind on punishment regardless of what he or she had seen or heard.

When a defendant claims he was improperly restricted on voir dire, the standard of review is whether the trial court abused its discretion. *Nunfio v. State*, 808 S.W.2d 482, 484 (Tex.Crim.App.1991). The propriety of the question that the defendant sought to ask determines the issue. *Id.*

A defendant may properly question prospective jurors about their feelings on the range of punishment and whether they would consider probation. *Mathis v. State*, 576 S.W.2d 835, 839 (Tex.Crim.App. 1979); *Saunders v. State*, 780 S.W.2d 471, 476 (Tex.App.—Corpus Christi 1989), *rev'd on other grounds*, No. 069–90, slip op. at 1 (Tex.Crim.App., May 13, 1992) (not yet reported). The venire may be questioned about what they have read or heard about the case. *Smith v. State*, 703 S.W.2d 641, 644 (Tex.Crim.App.1985); *Drinkert v. State*, 756 S.W.2d 844, 846 (Tex.App.—Corpus Christi 1988, no pet.). However, questions have been held improper that ask a member of the venire to describe the type of situations that should result in a death penalty, *Allridge v. State*, 762 S.W.2d 146, 163–64 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989); that ask a potential juror if he or she would be unable to consider life imprisonment in a hypothetical situation that was an accurate statement of the State's case, *White v. State*, 629 S.W.2d 701, 706 (Tex.Crim.App.1981), *cert. denied*, 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); that ask a member of the venire if he or she could assess a minimum sentence under certain described facts, *Williams v. State*, 481 S.W.2d 119, 121 (Tex.Crim.App. 1972); or that ask a venire member whether he or she would consider probation where a knife was used to commit murder, *Aquino v. State*, 710 S.W.2d 747, 752 (Tex.

App.—Houston [14th Dist.] 1986, pet. ref'd).

Here, the venire was properly examined generally by the trial court about whether they could consider in any murder case, no matter what the facts, the full range of punishment. As a result of the general examination and responses to the questionnaire, 52 members of the venire were questioned individually at the bench by the court and the attorneys concerning what each had read and heard about the case and whether that information biased any of them in favor of or against the defendant. The court also questioned them again about whether they had an open mind on the full range of punishment, no matter what they had previously heard or read.

Defense counsel's attempted question to prospective juror West, whether based on the publicity he had read, his mind was open to a five-year probated sentence if the defendants were guilty, sought not to probe any bias or prejudice, but to commit him to a sentence based on the "facts" portrayed in the pretrial publicity to which he had been exposed. We hold that the question proposed by defense counsel was improper because it attempted to commit the prospective juror to a range of punishment based on a specific set of facts. *Williams*, 481 S.W.2d at 121; *Saunders*, 780 S.W.2d at 476.

We overrule appellant's first point of error.

In his second and third points of error, appellant argues the trial court erred in not suppressing all evidence seized because (1) the arresting officers lacked probable cause to arrest under TEX.CONST. art. I, § 9, and (2) the arresting officers lacked authority under TEX.CODE CRIM.P.ANN. art. 14.04 (Vernon 1977).

At about 6:45 p.m. on August 9, 1990, four police officers, Allen, Thomas, Nessenthaler, and Boudreaux, entered the Bobbit house. Sergeants Allen and Thomas were wearing civilian clothes and arrived in an unmarked car. Officers Nessenthaler and Boudreaux, the backup unit called for by Allen and Thomas were uniformed and

driving a police car. The following information was obtained by the police before entering the house.

Witnesses provided police with the license plate number and a description of the car in which the assailants had left the scene. The police had not completed the trace of the license plate number on August 9.

Police investigators spoke with the companions of the complainant, two residents of the apartments, a girl the companions knew to be familiar with skinheads, and the parents of Rob Lyne. The police learned that the complainant had been beaten up by a group of boys the companions characterized as skinheads. The assailants, numbering four or five, were described as white males with shaved heads and one was said to be an extremely big person. This person had been called "Derek" by Rob Lyne who was known by the companions. Mrs. Lyne thought that "Derek" might be Derek Hilla, but also gave the name of another large friend of her son. The person driving the vehicle was thought to be "Kevin." Kevin was described as a drifter who would stay wherever he could. Another assailant was described as short, with a husky build and wearing round glasses. Some of the people were said to frequent the Bobbit house on Carolcrest. The Lynes stated their son had spent the night at the Bobbit house. They had spoken to him that morning, and he had denied any knowledge of anything happening.

After talking to the Lynes, Sergeants Allen and Thomas felt they needed to speak with Rob Lyne, so they drove the few miles to the Bobbit house on Carolcrest. When they arrived, they saw in the driveway a car matching the description and the license plate number provided by witnesses. They went down the street, parked their car where they could maintain sight of the house, and called for a marked unit. At the suppression hearing, Sergeant Thomas testified that they called for a marked unit because someone in uniform "helps calm the scene down," and because they did not know if there were a large number of people in the house.

Sergeants Allen and Thomas testified that they did not want anyone leaving the house, that they wanted to detain them for purposes of the investigation, and that for their safety and the safety of those in the house, they wanted to have all the occupants in the house secured. Sergeant Allen and Officer Boudreaux went to the front door; Sergeant Thomas and Officer Nessenthaler went to the back door. At some point, all of the officers drew their guns.

Sergeant Allen knocked at the front door, and announced himself as a police officer. He heard voices and movement within. He announced himself a few more times and repositioned himself away from the door. After a few minutes the door was opened by Sergeant Thomas.

At the rear, Sergeant Thomas and Officer Nessenthaler went through the open back gate; they saw a white male putting on tennis shoes who said he was Paul Bobbit. The officers patted him down for weapons. He told them Derek and Kevin were in the house, and to go on in. As Sergeant Thomas started in the back door, three teenage girls came running out. He left them and Bobbit with Officer Nessenthaler on the patio. He went through the house to the front door and let in the other two police officers.

Once in the house, Sergeant Allen called "police," and ordered everyone to come out with their hands up. A male and female appeared from a room at the top of the stairs. Sergeant Allen thought he fit the description of "Kevin," and the male confirmed it. He ordered Kevin and the female down the stairs in the direction of Officer Boudreaux. Allison was handcuffed. Sergeants Allen and Thomas proceeded up the stairs, calling out that they were the police. When they reached the landing, a second male appeared. Sergeant Allen thought he was the person with the round glasses; he identified himself as Miels. They ordered him downstairs where he was handcuffed to Bobbit.

Another male appeared, whom Sergeant Allen recognized from the descriptions as "Derek." Appellant confirmed it. Ser-

geant Thomas handcuffed him and told him to lay face down on the floor. The officers cleared the other rooms, found no one else, then assisted appellant up and took him downstairs where everyone else was. There were a total of eight people in the house, excluding the policemen.

Sergeant Allen took appellant out to the backyard, gave him *Miranda* warnings, and questioned him about the assault on Hung Truong. The interview lasted two or three minutes. At the interview, appellant confessed that he and Allison had assaulted the complainant. According to the testimony of Sergeant Thomas, appellant and Allison were put under arrest when they implicated themselves in the crime.

Sergeant Allen returned appellant to the living room. At that time, Sergeant Allen had Bobbit unhandcuffed because he believed Bobbit had no involvement in the offense. Sergeant Allen then took Miels outside and repeated the procedure he had followed with appellant. He returned to the living room with Miels and repeated the procedure with Allison. The police conducted no search of the house (except for their initial gathering up of all people in the house) or car before questioning the inhabitants of the house.

Appellant contends that, by handcuffing him and placing him under restraint with their guns drawn, the police had arrested him, without warrant, without probable cause, and without exigent circumstances that might excuse the absence of a warrant. At the suppression hearing, Sergeants Allen and Thomas stated appellant was not arrested (until his confession), but was detained in the course of their investigation. On appeal, the State does not concede that an arrest took place when appellant was handcuffed, but argues that if an arrest took place it was valid under TEX. CODE CRIM.P.ANN. art. 14.04 (Vernon 1977), as construed in *King v. State*, 631 S.W.2d 486 (Tex.Crim.App.), *cert. denied*, 459 U.S. 928, 103 S.Ct. 238, 74 L.Ed.2d 188 (1982) and *West v. State*, 720 S.W.2d 511 (Tex. Crim.App.1986), *cert. denied*, 481 U.S. 1072, 107 S.Ct. 2470, 95 L.Ed.2d 878 (1987).

Whether a detention is an investigative detention or an arrest depends upon the facts and circumstances surrounding the detention. *Amores v. State*, 816 S.W.2d 407, 412 (Tex.Crim.App.1991); *Hoag v. State*, 728 S.W.2d 375, 378–79 (Tex.Crim.App.1987). The reasonable use of handcuffs or the ordering of a suspect to lie down alone does not convert an investigative detention into an arrest. *Burkes v. State*, No. 801–90, slip op. at 5, 830 S.W.2d 922, 924 (Tex.Crim.App., Nov. 20, 1991) (not yet reported). Whether an officer believes a suspect is detained or arrested, is not determinative of the issue. *Amores*, 816 S.W.2d at 412; *Hoag*, 728 S.W.2d at 378.

Here, Sergeants Allen and Thomas believed they had not arrested appellant, at least until he had confessed to the offense. Based on conversations with the Lynes and witnesses to the offense, the officers had a reasonable articulable suspicion that the house on Carolcrest and Rob Lyne, who might be found there, were connected with the assault on the complainant. They arrived at the house, saw the car with the license plate number identified as having been used by the assailants, and received no response to their knock, although they heard movement and voices within. They were in a position where, to continue their investigation of the offense, they needed to secure their own safety and that of the others in the house. A violent assault had been committed, resulting in murder, and based on the presence of the car, it was likely that some of the suspects might be within. After securing the house, the officers proceeded to question the young men. The questioning period was relatively short, and resulted in the unhandcuffing of Bobbit. Before the questioning, the police did not search the house or vehicle for evidence. Based on all the facts and circumstances, we conclude that appellant was subjected to an investigative detention.

Assuming that the investigative detention was in fact an arrest, such a warrantless arrest is permissible only if (1) there is probable cause with respect to that individual, and (2) the arrest falls within one of the exceptions set forth in TEX.CODE CRIM.

P.Ann. arts. 14.01, 14.02 (Vernon 1977), art. 14.03 (Vernon Supp.1992), or art. 14.04 (Vernon 1977). *Stull v. State,* 772 S.W.2d 449, 451 (Tex.Crim.App.1989). By the time appellant was handcuffed, the police had probable cause regarding him.

■ When Sergeants Allen and Thomas drove to the Carolcrest house, they did not have probable cause to arrest appellant. They had descriptions of three males, possible names of two of them ("Kevin" and "Derek"), a car description (small, yellow or orange, imported), and a car license number, owner of the car unknown, but the registration showing it to be a Datsun. As they approached the drive, they saw the suspect car. When they entered the house, they saw that the descriptions and names matched the persons of Allison, Miels, and appellant. At that point, they had probable cause to arrest appellant. *See West,* 720 S.W.2d at 513.

Article 14.04 sanctions a warrantless arrest:

> Where it is shown by satisfactory proof to a peace officer, upon the representation of a credible person, that a felony has been committed, and that the offender is about to escape, so that there is no time to procure a warrant....

Tex.Code Crim.P.Ann. art. 14.04 (Vernon 1977). Clearly, it had been shown that a felony had been committed. In determining whether appellant was about to escape, we consider whether the information available to the arresting officers would justify the belief that appellant would take flight. *West,* 720 S.W.2d at 517.

■ Witnesses reported that the suspect car left the scene at a high rate of speed. Allison had been portrayed as a "drifter." A home telephone number had been provided for appellant, but no permanent address. Sergeants Allen and Thomas had spoken with the Lynes who were in contact with their son who was a friend of Allison and appellant. The police covered both the front and rear doors of the Bobbit house because of their concern that people would flee. The police knock was never answered by residents of the house. It was reasonable for the officers who arrest-

ed appellant to believe that, having been alerted to their interest in him, appellant would attempt to escape. *See West,* 720 S.W.2d at 517.

We overrule appellant's second and third points of error.

The discussion of the remaining points of error does not meet the criteria for publication, Tex.R.App.P. 90, and is thus ordered not published. The judgment is affirmed.