Affirmed and Opinion filed June 22, 2004









Affirmed and Opinion filed June 22, 2004.

 

In The

 

Fourteenth Court of Appeals

____________

 

NO. 14-03-00150-CR

____________

 

PHERNELL DION
BATEMAN,
Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 208th
District Court

Harris County, Texas

Trial Court Cause No. 935,180

 



 

O P I N I O N

Appellant, Phernell Dion Bateman was
convicted by a jury of murder and sentenced to 40 years incarceration in the
Texas Department of Criminal Justice, Institutional Division.  In twenty issues, appellant claims the evidence
is legally and factually insufficient to support his conviction and the trial
court erred in overruling his motion to suppress.  We affirm. 









                                                I. 
Background

On January 13,
2001, the complainant, Mosa Maimane, arrived at the Top Flight night club with
Bruce Joseph and Monte Harris around midnight. 
Joseph was on the dance floor while Maimane and Hall sat at a table.  While Joseph was on the dance floor, the DJ started
calling out the names of neighborhoods. 
Joseph testified that when the DJ called out ABraeswood,@ appellant was
walking towards him, Athrowing up a neighborhood sign,@ and he pushed
appellant away from him.  However, Joseph
later testified that he never had any physical contact with appellant, but only
put his arms out to keep appellant from getting too close to him.  According to Joseph, appellant left the dance
floor, made a phone call, and walked out of the club.  Joseph did not see appellant again until
after the club had closed, when he, Harris, and Maimane attempted to leave the
premises.  

Upon leaving the club, Joseph and Maimane
leaned against a car in the parking lot waiting for Harris to finish his
conversation with a woman.  Joseph
testified that he saw appellant on the driver=s side of his car
putting on a jacket and a hat; appellant was looking at him.  Joseph did not see appellant display a
weapon, but it appeared to him that appellant was Afixing to do
something to [him].@  Joseph
saw appellant get in his car.  

When Harris finished his conversation,
Joseph and Maimane got in Harris=s car.  Harris was in the driver=s seat, Joseph was
in the front passenger seat, and Maimane was in the back seat behind the
driver.  They were getting ready to leave
when appellant=s car pulled up next to their car.  The passenger window of appellant=s car rolled down
and Joseph saw the passenger.  When
Joseph heard shots, he ducked down. 
Harris tried to drive away when he heard the shots.  The first shot shattered the passenger
window.  Joseph and Harris heard about
six or seven shots.  








Immediately after the shooting, appellant=s vehicle drove
away.  Joseph got out of the car and
called 911.  Harris was shot in the leg
and was transported to the hospital by ambulance.  Joseph realized something was wrong with
Maimane when the paramedics looked inside the car, but never rendered any
treatment.  Maimane died of a gunshot
wound to the back of the head.  

Joseph gave a statement to the police
later that morning after the shooting. 
During the investigation, he viewed two photo spreads at the police
station.  Joseph picked out appellant=s photo as the
person he saw in the night club and who later was driving the car that pulled
along side of him at the time of the shooting. 
The second photo spread contained the photo of the passenger in
appellant=s car. 
Joseph was not able to identify the passenger.

          Harris saw the passenger in appellant=s car holding the
gun.  Harris was not able to identify
appellant in the lineup or the photo spread, but he was able to identify the
co-defendant, Aaron Nollie, as the passenger from a photo spread.  

Aaron Nollie pled to guilty to the murder
of Maimane and is serving a 35-year prison sentence in the Texas Department of
Corrections.  At appellant=s trial Nollie
testified that he and appellant were friends. 
Nollie saw appellant at the club that night; they had arrived
separately.  Nollie was standing at the
bar when appellant came up to him and told him Ahe had got into it
with some dudes.  He was fixing to leave
and go get his gun.@ 
Nollie told appellant, Athat=s on you,@ and appellant
left the club.  

Nollie next saw appellant about 45 minutes
later when appellant told him that his gun was in the car.  Nollie walked out to the car with
appellant.  The gun looked like a machine
gun.  Appellant and Nollie got in the car
and drove to the other side of the parking lot.  They sat in the car and talked.  Appellant told Nollie that Ahe was going to do
what he had to do.@ 
When three males were coming out of the club, appellant pointed and
showed Nollie the car they were getting into. 
Nollie recognized one of the guys as a regular at the club.  Appellant told Nollie that Ahe got into it
with some dudes.  They was throwing
signs.  He threw up some signs and they began
to argue.@ 
Appellant wanted to shoot them, but Nollie told him not to do that
because there were a lot of people in front of the club who would have seen
him.  








Nollie and appellant saw a female get into
the car with the three guys.  According
to Nollie, after the female got out of the car, appellant, who was driving,
pulled up on the left side the other car. 
The window of appellant=s car was already
rolled down some because Nollie had been smoking a cigarette.  Appellant Aslammed@ the car into
park, slid over to Nollie=s side, and began shooting at the other
car.  Appellant then slid back over to
his seat, put the car in drive, and drove away. 


Nollie told appellant to drop him off at
his house.  Nollie had already given the
keys to his car to a friend and that friend had left the club in Nollie=s car prior to the
shooting.  Nollie did not call the
police, but he told a friend=s girlfriend what
had happened.  A month later, appellant
came to Nollie=s house to get his friend to break down
the gun so he could hide it. 

After Nollie pled guilty to shooting
Maimane, the prosecutor talked to him about testifying in appellant=s case.  Nollie denied shooting Maimane and owning the
gun.  Nollie later found out that
appellant had identified him as the shooter. 


Landis Robinson testified that on January
13, 2001, he was at the apartment of his friend, Changa, at the Natchez
Apartments with several other people, including appellant.  Appellant left Changa=s apartment to go
to the club.  Robinson was asleep on the
couch when appellant returned to Changa=s apartment at
3:00 or 4:00 a.m.  Robinson Acould tell that
[appellant] had a very active night.@  Appellant was not Ahis normal self@; he was nervous
and mad.  According to Robinson,
appellant said AKilled the motherf-----s B we killed the
motherf------s.@  

According to Robinson, appellant said he
was at the club when A[t]hey was throwing up their hoods.@  Appellant was throwing up the sign for
Southwest Houston when a Adude walked up and slapped his hands down
and put Hiram Clarke in his face.@  Appellant said he was about to get into fight
when Nollie broke it up.  Appellant went
outside to get his assault rifle from his car and was going to return to the
club, but Nollie told him not to.  








Robinson further testified that appellant
said he got in the car; Nollie was driving. 
They waited for the guys to come out of the club, and then appellant
started shooting, and they drove off. 
Robinson stated that when an article about the shooting appeared in the
newspaper appellant stated, AWell, I didn=t do it, you know,
[Nollie] did it.  I was driving.@  Appellant told Robinson that he would have to
watch him because Robinson was from Hiram Clarke, the same area as the
victims.  Appellant also stated, AI=m through
fighting.  Anybody I have a problem with,
I=m going to blow
them away.@ 

On January 22, 2001, Detective James Bozeman
received a call from an auto theft detective that a jail inmate had information
concerning the shooting.  Robinson gave
Bozeman and his partner, P.T. Yochum, a statement and relayed what he knew
about the night of the shooting.  Bozeman
and Yochum were then able to develop leads on Nollie, appellant, and the
vehicle used in the shooting. 

Robinson called Bozeman on January 27,
2001, and told him the car involved in the shooting was at the Natchez
Apartments.  Bozeman and Yochum went with
Robinson to the apartment complex that day. 
Robinson showed them the car that was involved in the shooting.

Because Bozeman was out of town on January
28, 2001, Sergeant James Ramsey was asked to assist Yochum in this
investigation.  Ramsey received
information that there was a gold Cutlass, which was involved in the shooting,
located at the Natchez Apartments. 
Ramsey instructed Yochum to go to the apartment complex to see if the
vehicle was still there.  Ramsey told
Yochum to call him if he located the vehicle; Ramsey would then start work on
obtaining a search warrant for the vehicle.








Yochum called Ramsey and told him that he
had located the gold Cutlass, but there was a black Cutlass parked next to it
and several individuals were moving back and forth between the two
vehicles.  It appeared to Yochum that
something was being removed from the gold Cutlass and placed in the black
Cutlass.  Yochum believed both vehicles
were about to leave.  Ramsey instructed
Yochum to call for some uniformed units to help him secure the vehicles and the
individuals around them.  When Ramsey
arrived at the scene, four individuals were being detained separately in four
patrol cars.  

Appellant admitted to Yochum that he owned
both vehicles and claimed he was planning to sell the gold Cutlass.  Ramsey asked appellant if he would give his
consent to search the two vehicles and explained to appellant that he was not
obligated to give his consent.  Appellant
told Ramsey he was the owner of both vehicles and gave his consent to search.  Ramsey had the gold Cutlass vehicle towed to
an HPD examination building, and the black Cutlass photographed, inventoried of
its contents, and towed.  No gun or
ammunition was found in the black Cutlass, but a bill of sale indicating that
the gold Cutlass had been sold to appellant was recovered.  Appellant was transported to the police
station. 

Ramsey also obtained written consent from
appellant to search his room at his grandparents= house.  Ramsey met with appellant=s grandmother, who
also gave written consent.  The police
did not find any weapons or ammunition in appellant=s room.  

On February 22, 2001, Bozeman and Yochum
talked to appellant=s grandmother and grandfather at their
house.  Later that day, appellant=s grandmother
called Bozeman and Yochum, stating that she wanted to bring appellant in; she
brought appellant in and they interviewed him. 
Appellant gave a verbal statement, which was not recorded.  Yochum showed appellant a photo spread, which
included a photo of Aaron Nollie. 
Appellant identified Nollie as the shooter.  Appellant told them he was the driver.  Appellant was cooperative and was free to
leave.  








The police recovered a spent shell casing
from the parking lot of the club and another shell casing from underneath the
backseat of the gold Cutlass.  A bullet
was recovered from complainant during the autopsy.  Mohamed Al-Mohamed, an HPD firearms examiner,
examined the two spent shell casings and determined that the two casings were
fired from the same gun.  Based on the
general rifling characteristics, Al-Mohamed determined the bullet recovered
from the complainant=s body was fired from a High Point, and
the casings could have come from a High Point 9mm Luger pistol or rifle.  

Appellant testified that he saw Nollie at
the club on January 13, 2001.  The club
DJ was yelling, Aput your hoods up in the air.@  The dance floor was crowded.  Appellant did not recognize Joseph as having
been on the dance floor and he did not have any altercations with anyone on the
dance floor that night.  

Appellant walked outside by himself about
five minutes before the club closed to use the phone.  Appellant agreed to give Nollie a ride
home.  Appellant went to his car and put
on his coat and hat.  Appellant did not
complain to Nollie about any problems with anyone in the club.  Appellant started to drive away when Nollie
told him to stop; appellant stoppedCNollie rolled down
the window, pulled out a gun, and started shooting.  After the shooting stopped, Nollie said, Adrive, drive, go,
go, go, go, go, go!@ 
Appellant drove away.  Nollie had
not given appellant any indication of why he wanted appellant to stop.  Appellant had not seen Nollie with a gun that
evening before the shooting.  

Appellant drove to his mother=s house, left his
car there, and had a friend drop him off at the Natchez Apartments.  Appellant spoke to Robinson, but never told
him that he shot at the other car; instead, he told Robinson that Nollie had
shot at someone in a car.  He told
Robinson that if the police asked him about the murder, he Awas going to give
[Nollie] up.@ 

Appellant testified that he did not aid,
assist, direct, or solicit Nollie to shoot at the other car; nor did he provide
Nollie with a gun.  Appellant stated that
he purchased the gold Cutlass on January 9, 2001, and was scheduled to finish
paying for the vehicle on January 12, 2001. 
Appellant claimed that did not tell Yochum or Ramsey that he planned to
sell the gold Cutlass and keep the black Cutlass.  








                                         II. 
Motion to Suppress

In his seventeenth
through twentieth issues, appellant complains the trial court abused its
discretion in overruling his motion to suppress.  A trial court=s ruling on a
motion to suppress is reviewed under an abuse of discretion standard.  Oles v. State, 993 S.W.2d 103, 106
(Tex. Crim. App. 1999).  In a hearing on
a motion to suppress, the trial court is the sole trier of fact and judge of
the credibility of the witnesses and the weight to be given their
testimony.  State v. Ross, 32
S.W.3d 853, 855 (Tex. Crim. App. 2000). 
Because the trial court observes the demeanor and appearance of the
witnesses, it may believe or disbelieve all or any part of a witness= testimony, even
if that testimony is controverted.  Id.  When, as in this case, the trial court does
not file findings of fact, we view the evidence in the light most favorable to
the trial court=s ruling and assume the trial court made
implicit findings of fact that support its ruling as long as those findings are
supported by the record.  Carmouche v.
State, 10 S.W.3d 323, 328 (Tex. Crim. App. 2000).  

Prior to the start of trial, the trial
court conducted a hearing on appellant=s motion to
suppress.  At the hearing, Yochum
testified that on January 28, 2001, he received information that a
gold-colored, two-door Oldsmobile Cutlass Supreme, with Texas license plate
number AWTK 44D,@ which had been
involved in this case, was located at an apartment complex.  Sergeant James Ramsey told Yochum that if the
car were at the apartment complex, he would start drawing up a search
warrant.  Yochum located the gold
Cutlass; however, he also observed several men standing around it and another
black vehicle parked next to it.  The
hoods and trunks of both vehicles were open. 
It appeared to Yochum that the men were moving items from the gold
Cutlass to the black car.  Yochum was
concerned that they were losing or were going to lose evidence in a murder
case.  








Yochum called Ramsey and described what he
had observed.  Ramsey advised Yochum to
call for patrol officers to assist him in detaining everyone around the gold
Cutlass and in seizing the vehicle.  With
weapons drawn, the police ordered everyone to lie down on the ground.  All the individuals were handcuffed and
separated.  Appellant was placed in the
back seat of a patrol car.  Appellant
admitted that he was the owner of the gold Cutlass.  

When Ramsey arrived at the scene, he took
appellant out of the patrol car and removed the handcuffs.  Appellant told Ramsey that they were
switching a battery from one car to the other. 
Ramsey had appellant sign two consent to search formsCone for the gold
Cutlass and one for the black vehicle. 
Ramsey explained to appellant the content of the consent forms and told
him he was under no obligation to sign them. 
Ramsey than allowed appellant to read the consent forms.  Appellant did not appear to be intoxicated,
but was alert, coherent, and cooperative. 
Ramsey did not make any threats or promises to appellant in order to
obtain his signature.  Nor did Ramsey
have his weapon drawn.  

Officers Carlos Miller and Alberto
Elizondo, who witnessed the consent to search forms, were standing about 10
feet behind Ramsey while he discussed the forms with appellant.  Miller and Elizondo confirmed that Ramsey did
not threaten appellant, make appellant any promises, or have his weapon drawn.  Like Ramsey, Miller and Elizondo did not make
any threats or promises, and did not have their weapons drawn.  Miller and Elizondo both testified that
appellant was given time to read the forms and appeared to understand
them.  

After appellant=s consent to
search had been obtained, the gold Cutlass was towed to the HPD examination
building.  Appellant was transported to
the HPD central jail facility.  Appellant
gave a statement and was then placed back into detention.  After the police interviewed the other
individuals who had been detained in the parking lot of the apartment complex,
appellant participated in a video lineup. 
Appellant was released without being charged.  On January 30, 2001, a search warrant was
obtained.  








                                          A.  Investigatory Detention

Appellant argues
he was arrested when he was handcuffed and because there was no probable cause
to arrest him, the trial court erred in not suppressing the shell casing and
bill of sale recovered from his vehicles and any statements he made while in
custody.  The State argues appellant was
not arrested when he was handcuffed, but was merely detained for further
investigation.  

An arrest occurs when a person=s liberty of
movement is restricted or restrained.  Amores
v. State, 816 S.W.2d 407, 411 (Tex. Crim. App. 1991).  An investigative detention occurs when the
police stop and briefly detain an individual to ascertain his identity, the
reason for being in the area, or other such similar inquiry.  Id. at 412.  

Handcuffing or ordering a suspect to lie
down before questioning does not necessarily convert an investigative detention
into an arrest.  Goldberg v. State,
95 S.W.3d 345, 360 (Tex. App.CHouston [1st
Dist.] 2002, pet. ref=d), cert. denied, __ U.S. __, 124
S. Ct. 1436 (2004); Nargi v. State, 895 S.W.2d 820, 822 (Tex. App.CHouston [14th
Dist.] 1995), pet. dism=d, improvidently
granted, 922 S.W.2d 180 (Tex. Crim. App. 1996).  The Texas Court of Criminal Appeals has
rejected the notion that there is a Abright-line@ rule that mere
handcuffing always constitutes an arrest. 
Rhodes State, 945 S.W.2d 115, 118 (Tex. Crim. App. 1997).  

Whether an individual is under arrest is
not to be determined solely by the opinion of the arresting officer; instead,
the officer=s opinion is a factor to consider in
addition to facts and circumstances of the detention.  Amores, 816 S.W.2d at 412.  Law enforcement officers may use such force
as is reasonably necessary to effect the goal of the stop: investigation,
maintenance of the status quo, or officer safety.  Rhodes, 945 S.W.2d at 117.  Reasonableness must be judged from the
perspective of a reasonable officer, rather than with the advantage of
hindsight.  Id. at 118.  Moreover, allowances must be made for the
fact that officers must make quick decisions under tense, uncertain, and
rapidly changing circumstances.  Id.









An investigative detention implies that
the obtrusive act is for the purpose of actually investigating.  Burkes v. State, 830 S.W.2d 922, 925
(Tex. Crim. App. 1991).  Thus, where no
investigation is conducted, the detention cannot be considered investigatory
and rises to the level of an arrest.  Id.  

In Goldberg, an officer was
dispatched to a residence to seize a vehicle in a murder investigation.  95 S.W.3d at 360.  Appellant arrived at the house and approached
the officer.  Id. at 356.  At that time, the officer was clearly
conducting an investigation when the appellant arrived in a different vehicle
and approached him.  Id. 360.  When the appellant responded that he was the
person the officer was seeking, the officer handcuffed him.  Id. at 356.  The court of appeals held that it was
reasonable, in light of the fact that a brutal murder had just occurred, for
the officer to handcuff the appellant for the officer=s own safety while
attempting to determine whether the appellant had been driving the vehicle that
day and to continue to detain the appellant while he completed his
investigation of the scene.  Id.
at 360. 

In Hilla v. State, the police
arrived at the house where appellant was believed to be and observed the car
identified as having been involved in an assault parked at the house.  832 S.W.2d 773, 778 (Tex. App.CHouston [1st
Dist.] 1992, pet. ref=d). 
When the police approached the front door and knocked, they received no
response even though they could hear voices inside.  Id. 
When the police entered the house, they handcuffed appellant and told
him to lie down on the floor.  Id.
at 777B78.  The court observed that in order to continue
the investigation, the police needed to secure their own safety and that of the
others in the house.  Id. at
778.  The court further observed that a
violent assault had occurred, resulting in a murder, and based on the presence
of the car, it was likely that some of the suspects could be in the house.  Id. 
The court held that based on the facts and circumstances, appellant was
subject only to an investigative detention, not an arrest.  Id. 









Here, Yochum testified that the gold
Cutlass was the focus of the investigation. 
Yochum went to the apartment complex to locate the gold Cutlass.  However, when Yochum arrived at the scene, he
observed what appeared to be several individuals moving things from the suspect
vehicle to another vehicle.  Yochum
believed the vehicles were about to leave, and he was concerned they were going
to lose evidence in the murder case. 
Ramsey instructed Yochum to call for uniformed patrol units to detain
everyone until he could arrive.  Given
that appellant=s vehicle had been identified as being in
involved in a murder, it was reasonable for Yochum to handcuff appellant for
safety reasons while securing the scene for further investigation.  See Goldberg, 95 S.W.3d at 360; Hilla,
832 S.W.2d at 778.  

                                          B.  Reasonable Suspicion

Having determined that appellant=s detention was an
investigatory detention rather than an arrest, we next consider whether
appellant=s investigatory detention was based upon
reasonable suspicion.  Before a detention
is justified, the officer must possess reasonable suspicion to detain the
suspect, i.e., the officer must have specific, articuable facts, which,
in light of his experience and general knowledge, together with rational
inferences from those facts, would reasonably warrant the intrusion on the
freedom of the citizen stopped for investigation.  Gurrola v. State, 877 S.W.2d 300, 302
(Tex. Crim. App. 1994).  The articuable
facts Amust create some
reasonable suspicion that some activity out of the ordinary is occurring or has
occurred, some suggestion to connect the detainee with the unusual activity,
and some indication the unusual activity is related to crime.@  Garza v. State, 771 S.W.2d 549, 558
(Tex. Crim. App. 1989).  There need only
be an objective basis for the stop; the subjective intent of the officer is
irrelevant.  Garcia v. State, 43
S.W.3d 527, 530 (Tex. Crim. App. 2001).








The determination of reasonable suspicion
is made by considering the totality of the circumstances.  Id. 
In conducting the totality of the circumstances determination, the
reviewing court uses a bifurcated standard of review: (1) giving almost total
deference to a trial court=s determination of
historical facts and application of law to fact questions that turn on
credibility and demeanor, and (2) reviewing de novo application of law to fact
questions that do not turn on credibility and demeanor.  Id. 
In other words, we give almost total deference to the trial court=s determination of
the actual facts and review de novo whether those facts are sufficient to give
rise to reasonable suspicion.  Id.  

The gold Cutlass had been identified as
having been involved in the murder of Maimane. 
It appeared to Yochum that items were being removed from that vehicle
and it was going to be moved from the parking lot of the apartment
complex.  Appellant admitted to Yochum
that he owned the gold Cutless.  Under
these circumstances, it was reasonable for Yochum to suspect that appellant was
involved in the shooting and to detain him for further investigation.  

                                             C.  Consent to Search

We next consider whether appellant=s consent to the
search of the gold Cutlass was voluntary. 
Consent to search is one of the well-established exceptions to the
constitutional requirements of both a warrant and probable cause.  Guevara v. State, 97 S.W.3d 579, 582
(Tex. Crim. App. 2003).  However, to be a
valid exception, such consent must be voluntary.  Reasor v. State, 12 S.W.3d 813, 817
(Tex. Crim. App. 2000).  Consent is not
established by showing nothing more than acquiescence to a claim of lawful
authority.  Carmouche, 10 S.W.3d
at 331.  The trial court A>must [assess] the
totality of all the surrounding circumstancesCboth the characteristics
of the accused and the details of the interrogation.=@  Reasor, 12 S.W.3d at 818 (quoting Schneckloth
v. Bustamonte, 412 U.S. 218, 226 (1973)). 
ABy looking at the
circumstances leading up to the search, the reaction of the accused to
pressure, and any other factor deemed relevant, a trial court can determine
whether the statement of consent was given voluntarily.@  Id. 
Thus, the validity of a consent to search is a question of fact to be
determined from all the circumstances.  Guevara,
97 S.W.3d at 582.  Under the Texas
Constitution, the State must prove the voluntariness of consent by clear and
convincing evidence.  Reason, 12
S.W.3d at 818.  








Ramsey had removed the handcuffs before
discussing the consent to search forms with appellant.  Neither Ramsey nor the other officers had
their weapons drawn.  Ramsey did not
coerce, threaten, or promise appellant anything in order to obtain his
consent.  Ramsey gave appellant time to
read the consent to search forms and explained that he was under no obligation
to sign the forms.  Appellant did not
appear to be intoxicated, but, instead, was alert, coherent, and
cooperative.  

Considering all the circumstances, we
conclude that the State proved by clear and convincing evidence that appellant
consented voluntarily to the search of both vehicles.  The trial court did not abuse its discretion
in denying appellant=s motion to suppress the shell casing and
the bill of sale for the gold Cutlass Supreme. 
Appellant=s seventeenth through nineteenth issues
are overruled.  

                                            D.  Custodial Statement

In his twentieth issue, appellant complains that the trial
court abused its discretion in overruling his motion to suppress his custodial
statement to the police as the fruit of his warrantless arrest.  Although appellant filed a pretrial motion to
suppress his written and oral statements, at the beginning of the hearing on
appellant=s motion to suppress evidence, appellant=s trial counsel
expressly stated to the trial court that appellant was waiving any challenge to
his statement given while in custody: 

. . . I also filed
a motion to suppress any written statements or oral confessions, motions before
this Court.  I=m advising the
Court right now that we are waiving that motion.  We have decided to withdraw our challenge to
my client=s statement that was given while in
custody.  

Consequently, the trial court never ruled
on appellant=s motion to suppress his written and oral
statements.  Appellant waived this issue
and may not raise this complaint on appeal. 
Tex. R. App. P. 33.1.  Appellant=s twentieth issue
is overruled.  








                                           III. 
Legal Sufficiency

In his first through sixteenth issues,
appellant challenges the legal and factual sufficiency of the evidence
supporting his conviction for murder. 
When reviewing the legal sufficiency of the evidence, we must view the
evidence in a light most favorable to the verdict and determine whether any
rational trier of fact could have found the essential elements of the offense
beyond a reasonable doubt.  Jackson v.
Virginia, 443 U.S. 307, 319 (1979); Wilson v. State, 7 S.W.3d 136,
141 (Tex. Crim. App. 1999).  In conducting
this review, we do not engage in a second evaluation of the weight and
credibility of the evidence, but only ensure that the jury reached a rational
decision.  Muniz v. State, 851
S.W.2d 238, 246 (Tex. Crim. App. 1993).  

The jury is the sole judge of the facts,
the credibility of the witnesses, and the weight to be given the evidence.  Beckham v. State, 29 S.W.3d 148, 152
(Tex. App.CHouston [14th Dist.] 2000, pet. ref=d).  Therefore, the jury may believe or disbelieve
all or part of any witness= testimony.  Margraves v. State, 34 S.W.3d 912, 919
(Tex. Crim. App. 2000).  Reconciliation
of any conflicts in the evidence falls within the exclusive province of the
jury.  Id.  

A person commits the offense of murder if he:

(1) intentionally or knowingly
causes the death of an individual; [or]

(2) intends to cause serious bodily injury and commits an
act clearly dangerous to human life that causes the death of an individual.

Tex. Pen. Code
Ann. ' 19.02(b)(1), (2) (Vernon 2003).  

The indictment accordingly alleged, in relevant part:  








. . . PHERNELL DION BATEMAN,
hereafter styled the Defendant, heretofore on or about JANUARY 13, 2001, did
then and there unlawfully, intentionally and knowingly cause the death of MOSA
MAIMANE, hereinafter styled the Complainant, by shooting the Complainant with a
deadly weapon, namely, a FIREARM.

. . . PHERNELL
DION BATEMAN, hereinafter styled Defendant, heretofore on or about JANUARY 13,
2001, did then and there unlawfully intend to cause serious bodily injury to
MOSA MAIMANE, hereinafter called the Complainant, and did cause the death of
the Complainant by intentionally and knowingly committing an act clearly
dangerous to human life, namely, BY DISCHARGING A FIREARM INTO A VEHICLE
OCCUPIED BY THE COMPLAINANT.  

Under the court=s charge in this
case, the jury could find appellant guilty of murder under any one of eight
theories: 

(1) appellant, acting alone,
intended to cause the death of complainant; 

(2) appellant, acting as a party to
the offense with Nollie, intended to cause the death of complainant; 

(3) appellant, acting alone,
intended to cause serious bodily injury to complainant, resulting in death; 

(4) appellant, acting as a party to
the offense with Nollie, intended to cause serious bodily injury to complainant,
resulting in death; 

(5) appellant, acting alone,
intended to cause the death of Bruce Joseph, but caused the death of
complainant; 

(6) appellant, acting as a party to
the offense with Nollie, intended to cause the death of Bruce Joseph, but
caused the death of complainant; 

(7) appellant, acting alone,
intended to cause bodily injury to Bruce Joseph, but caused the death of
complainant; and 

(8) appellant,
acting as a party to the offense with Nollie, intended to cause serious bodily
injury to Bruce Joseph, but caused the death of complainant.

                                                 A.  Specific Intent








In his first and second points of error,
appellant asserts the evidence is legally insufficient to show that he
intentionally or knowingly caused the death of complainant, acting either as
principal or as a party.  In this third
and fourth points of error, appellant claims the evidence is legally
insufficient to show that he intended to cause serious bodily injury to
complainant by intentionally or knowingly committing an act clearly dangerous
to human life by discharging a weapon in the vehicle occupied by complainant
and causing complaint=s death, acting either as principal or as
a party.  

AA person acts
intentionally, or with intent, with respect to the nature of his conduct or to
a result of his conduct when it is his conscious objective or desire to engage
in the conduct or cause the result.@  Tex.
Pen. Code Ann. ' 6.03(a) (Vernon 2003).  An accused=s intent can be
inferred from his acts, words, and conduct. 
Henderson v. State, 825 S.W.2d 746, 749 (Tex. App.CHouston [14th
Dist.] 1992, pet. ref=d) (citing Dues v. State, 634
S.W.2d 304, 305 (Tex. Crim. App. 1982)). 
A specific intent to kill may also be inferred from the use of a deadly
weapon.  Id. (citing Moreno v.
State, 755 S.W.2d 866, 868 (Tex. Crim. App. 1988)).  A handgun is a deadly weapon per se.  Id. (citing Tex. Pen. Code Ann. '
1.07(a)(11)(A)).  Thus, the use of a
deadly weapon infers the specific intent to kill unless in the manner of its
use it is reasonably apparent that death or serious bodily injury could not
result.  Vuong v. State, 830
S.W.2d 929, 934 (Tex. Crim. App. 1992); Godsey v. State, 719 S.W.2d 578,
580B81 (Tex. Crim.
App. 1986).  Moreover, if a deadly weapon
is used in a deadly manner, the inference is almost conclusive that the
defendant intended to kill.  Adanandus
v. State, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (quoting Godsey,
719 S.W.2d at 581).  








Firing a gun in the direction of an
individual is an act which is clearly dangerous to human life.  Forest v. State, 989 S.W.2d 365, 368
(Tex. Crim. App. 1999) (holding testimony that appellant only intended to shoot
victim Ain the butt@ established
appellant intended to cause serious bodily injury and, thus, establishing that
appellant was guilty of murder under section 19.02(b)(2)); Harrell v. State,
659 S.W.2d 825, 827 (Tex. Crim. App. 1983) (holding appellant=s testimony that
he shot deceased, but only intended to hit him in arm, established that
appellant intended to cause serious bodily injury to deceased and committed act
clearly dangerous to human life); Juarez v. State, 961 S.W.2d 378, 384
(Tex. App.CHouston [1st Dist.] 1997, pet. ref=d) (holding that
where appellant intentionally fired at car he knew was occupied even though he
did not point gun Astraight towards them,@ was evidence that
appellant intended to cause serious bodily injury and committed an act clearly
dangerous to human life causing victim=s death under
section 19.02(b)(2)).  Section 9.02(b)(2)
does not require the State to prove a specific intent to kill.  Harrell, 659 S.W.2d at 827.[1]  Proof of the culpable state of mind is
usually proved by circumstantial evidence. 
Henderson, 825 S.W.2d at 749; Warren v. State, 797 S.W.2d
161, 164 (Tex. App.CHouston [14th Dist.] 1990, pet. ref=d).  

Nollie testified that appellant had told
him that Ahe had got into it with some dudes@ and he was going
to leave to get his gun.  A while later,
appellant returned and told Nollie he had a gun in his car.  Nollie saw what looked like a machine gun in
appellant=s car. 
Appellant pointed to three males and told Nollie that he had a problem
with them.  According to Nollie,
appellant said he wanted to shoot them. 
Nollie testified that appellant was driving across the parking lot when
he Aslammed@ the car into
park, slid over to the passenger seat, began shooting at the other car.  

Robinson testified that he heard appellant
say Awe killed the
motherf-----s.@ 
Appellant told Robinson he went outside to get his assault rifle after Aa dude walked up
and slapped his hands down and put Hiram Clarke in his face,@ but Nollie told
him not to go into the club with the rifle.

Reviewing the evidence in the light most
favorable to the jury=s verdict, we conclude a rational jury
could have found appellant shot and intentionally killed Maimane or that
appellant intended to cause Maimane serious bodily injury and committed an act
clearly dangerous to human life by discharging a weapon into the car Maimane
occupied, thereby causing his death.








                                              B.  Law of the Parties

Under the law of the parties, the State is able to enlarge
a defendant=s criminal responsibility to acts in which
he may not be the principal actor.  Goff
v. State, 931 S.W.2d 537, 544 (Tex. Crim. App. 1996).  Section 7.02 of the Texas Penal Code provides
with respect to law of the parties, in relevant part:

(a) A person is criminally
responsible for an offense committed by the conduct of another if:

 

                                                    *        *       
*

(2) acting with intent to promote or assist the commission
of the offense, he solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense.

Tex. Pen. Code
Ann. '7.02(a)(2) (Vernon 2003).  

Thus, to prove that the accused acted as a
party to an offense, the State must prove that the accused acted with the
intent to promote or assist in the commission of the offense by soliciting,
encouraging, directing, aiding, or attempting to aid the other person in its
commission.  Martin v. State, 753
S.W.2d 384, 385 (Tex. Crim. App. 1988).  A>In determining
whether the accused participated as a party, the court may look to events
occurring before, during and after the commission of the offense, and may rely
on actions of the defendant which show an understanding and common design to do
the prohibited act.=@  Ransom v. State, 920 S.W.2d 288, 302
(Tex. Crim. App. 1994) (quoting Cordova v. State, 698 S.W.2d 107, 111
(Tex. Crim. App. 1985)).  Party status
may be proved by circumstantial evidence. 
Id.  Mere presence at the
scene of the offense does not establish guilt as a party to the offense.  Porter v. State, 634 S.W.2d 846, 849
(Tex. Crim. App. 1982).  Presence at the
scene, however, is a circumstance tending to prove guilt which, when combined
with other facts, may suffice to show that the accused was a participant.  Valdez v. State, 623 S.W.2d 317, 321
(Tex. Crim. App. 1979).  Moreover, while
flight alone will not support a guilty verdict, evidence of flight from the
scene of the offense is a circumstance from which an inference of guilt may be
drawn.  Id.  








Appellant admitted that he was driving the
car and Nollie was the shooter. 
Appellant testified that after Nollie had stopped shooting, he sped a
away from the parking lot of the club. 
Thus, appellant was at the scene of the shooting, drove the car involved
in the shooting, and fled with the alleged shooter from the scene.  Under these circumstances, the jury could
infer that appellant was acting with Nollie in the commission of the offense by
either intentionally killing Maimane or in intending to cause Maimane serious
bodily injury and committing an act clearly dangerous to human life, causing
Maimane=s death.  See Flores v. State, 491 S.W.2d 144,
146 (Tex. Crim. App. 1973) (holding evidence that defendant was outside of bar
with co-defendant shortly before shooting, that appellant was driver of car
that pursued deceased, and that fatal shot came from direction of car which
appellant was driving was sufficient to conclude defendant was acting with
another in commission of murder). 
Appellant=s first through fourth issues are
overruled.

                                              C.  Transferred Intent

In his fifth, sixth, seventh, and eighth
issues, appellant claims the evidence is legally insufficient to support his
conviction based on the law of transferred intent.  Under the theory of transferred intent, a
person is criminally responsible for causing a result if the only difference
between what actually occurred and what he desired, contemplated, or risked is
that a different person or property was injured, harmed, or otherwise
affected.  Tex. Pen. Code Ann. ' 6.04(b)(2)
(Vernon 2003).  For example, the
defendant intends to shoot one person, but misses and strikes another.  Martinez v. State, 844 S.W.2d 279, 282
(Tex. App.CSan Antonio 1992, pet. ref=d).  The intent to harm the intended victim
transfers to the actual victim and the defendant is guilty just as if he had
struck the intended victim.  Id.  Section 6.04(b)(2) evinces a legislative
policy to make a defendant, who acts with the specific intent to kill,
criminally responsible for the consequences of his voluntary acts.  Norris v. State, 902 S.W.2d 428, 437
(Tex. Crim. App. 1995).








Joseph testified that while he was on the
dance floor, he had to put his arms out to keep appellant from getting too
close as the DJ was calling out neighborhoods and appellant was Athrowing up a
neighborhood sign.@ 
Joseph also testified that appellant was looking at him in the club
parking lot and appeared to him that appellant was Afixing to do
something to [him].@ 
Viewing the evidence in the light most favorable to the verdict, a
rational jury could conclude that appellant, either as principal or as a party,
could have intended to shoot Joseph, but shot Maimane instead, killing
him.  Appellant=s fifth through
eighth issues are overruled. 

                                       IV. 
Factual Insufficiency

In his ninth through sixteenth issues,
appellant challenges the factual sufficiency of the evidence supporting his
conviction for murder under any of the eight theories under which the jury
could have convicted him.  








When reviewing claims of factual
insufficiency, it is our duty to examine the jury=s weighing of the
evidence.  Clewis v. State, 922
S.W.2d 126, 133, 134 (Tex. Crim. App. 1996). 
There are two ways in which evidence can be factually insufficient:  (1) the evidence is so weak as to be clearly
wrong and manifestly unjust, or (2) the finding of a vital fact is so contrary
to the great weight and preponderance of the evidence as to be clearly wrong.  Zuliani v. State, 97 S.W.3d 589, 593 (Tex.
Crim. App. 2003).  Determining which
standard applies depends upon whether the complaining party had the burden of
proof at trial.  Id.  If the complaining party did not have the
burden of proof, then the Amanifestly unjust@ standard
applies.  Id.  On the other hand, if the complaining party
had the burden of proof, then the Aagainst the great
weight and preponderance@ standard applies.  Id. 
Under the Texas Court of Criminal Appeals= modified
approach, if the defendant challenges the factual sufficiency of the elements
of the offense, even though the State had the burden of proof, we must review
the evidence using both standards.  Id.  Thus, when reviewing factual sufficiency
challenges, we must determine Awhether a neutral
review of all of the evidence, both for and against the finding, demonstrates
that the proof of guilt is so obviously weak as to undermine confidence in the
jury=s determination,
or the proof of guilt, although adequate if taken alone, is greatly outweighed
by contrary proof.@  Johnson
v. State, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).  

Appellant primarily complains that the
State=s case was Abuilt upon the testimony
of convicted felons and a confessed killer, Aaron Nollie, who would say and do
anything in order to avoid incarceration and/or to retaliate for Appellant=s cooperation with
police.@  Appellant also asserts the testimony of
Nollie, Robinson, and Joseph Ais simply not
credible.@ 

The evidence showed that Nollie pled
guilty to and was serving a 35-year prison sentence for the murder of
Maimane.  Nollie also had two other
felony convictions for unauthorized use of a motor vehicle and possession of a
controlled substance.  The evidence also
showed Robinson was in custody for 90 days as a condition of probation in
Harris County for aggravated assault at the time of appellant=s trial, and had
been on probation in Fort Bend County for aggravated assault in 1997.  There was no evidence at trial that Joseph
has any criminal record.  

Appellant testified that he did not
recognize Joseph as having been on the dance floor on the night of the
shooting.  Appellant further testified
that Nollie was the shooter and he did not know Nollie had a gun with him that
night or that Nollie had planned to shoot anyone.  The jury heard evidence that appellant had
three prior convictions for theft, one conviction for possession of a
controlled substance, and two convictions for possession with intent to deliver,
and was on parole at the time of the shooting. 


The jury was free to believe or disbelieve
the testimony of any witness and to reconcile any conflicts in the
testimony.  Margraves, 34 S.W.3d
at 919.  The jury apparently did not
believe appellant=s testimony as to his role in the
shooting.  Considering all the evidence,
we do not find it so weak as to be clearly wrong and manifestly unjust.  Appellant=s ninth through
sixteenth issues are overruled.  








Accordingly, the judgment of the trial
court is affirmed.

 

 

 

 

/s/      J. Harvey Hudson

Justice

 

 

 

 

Judgment
rendered and Opinion filed June 22, 2004.

Panel
consists of Justices Yates, Anderson, and Hudson.

Do
Not Publish C Tex.
R. App. P. 47.2(b).

 

 

 

 

 

 











[1]  Current
Section 19.02(b)(2) was formerly found at Section 19.02(a)(2) of the Texas
Penal Code. Act of June 14, 1973, 62nd R.S., ' 1, 1973
Tex. Gen. Laws 1123, amended by Act of June 19, 1993, 73rd Leg., R.S.,
ch. 900, ' 1.01, 1993 Tex. Gen. Laws 3613.