Opinion issued February 1, 2007

 












In The

Court of Appeals

For The

First District of Texas






NO. 01-05-00455-CR






DOMINGO TRUJILLO, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 208th District Court

Harris County, Texas

Trial Court Cause No. 10000245






MEMORANDUM OPINION


 A jury convicted appellant, Domingo Trujillo, of murder and assessed
punishment at 40 years' confinement and a $10,000 fine. In four points of error,
appellant contends that (1) the trial court erred in overruling his motion to suppress
and admitting evidence obtained by police officers while acting outside their
jurisdiction, (2) denying his challenges for cause as to two prospective jurors, and (3)
admitting prejudicial and inflammatory autopsy photographs into evidence. We
affirm.

BACKGROUND

1. The Initial Altercation

 Two-year-old Priscilla Perez lived in an apartment with her mother, Jessica
Sanchez. Also living in the apartment were Jessica's friend, Lisa McCrory, Jessica's
sister, Erica, and Erica's two children. On November 5, 2003, Jimmy Trujillo and
Jacob Martinez visited Erica at the apartment. The three drank beer and watched
television until Jessica asked them to leave. Jimmy called appellant and asked for a
ride home.

 When appellant arrived at the apartment he was drunk, and he told Jimmy that
he had wrecked his girlfriend's car on the way. Jimmy introduced appellant to the
women and Martinez. When appellant noticed Martinez's tattoos, the two began
arguing about gangs. The arguing escalated into a physical altercation, with both men
shoving each other and fighting. Erica then got a kitchen knife and entered the fray
on Martinez's behalf. During the fight, Erica inflicted a small cut on appellant's chest. 
Appellant yelled that he was going to " **** her up and that he was going to come
back and mess her up."

 Jessica called the police. When Officer K. Tolls of the Houston Police
Department arrived, the fight was over, but Jessica pointed out appellant, who was
peeking around the corner of the building. Tolls questioned appellant, who told him
that Erica had cut him. Tolls reported that appellant was "belligerent, rude, cursing
at officer, uncooperative, [and] intoxicated." Appellant wanted Erica arrested for
cutting him. Tolls called the District Attorney's office, but was instructed by intake
at the District Attorney's office that charges would not be filed. As a result, Tolls did
not arrest anyone, and he told Jimmy Trujillo to take appellant and leave. Appellant
was instructed not to return for his girlfriend's car until the next day because he was
intoxicated. As Jimmy and appellant drove away, appellant was still yelling and
cursing at the officers and taunting them.

2. The Murder

 At around 3:30 a.m., Tolls returned to the police station and began writing his
report of the incident. After working on the report for about 30 minutes, Tolls heard
a dispatch to Jessica's apartment. There had been a shooting and Tolls was certain
that it must be related to the earlier altercation. When he arrived, Tolls saw
paramedics taking Priscilla away in an ambulance. She died soon thereafter.

 Priscilla had been awakened by the sound of her mother and Lisa arguing with
Erica over the earlier altercation and had come downstairs. When her mother told
Priscilla to go back to bed, Priscilla laughed, stuck her tongue out, and ran towards the
living room. As she passed the front door, several shotgun blasts tore through the
front door, peppering her head and chest with shotgun pellets. Erica dragged Priscilla
into the bathroom, where Lisa picked her up and hid in the bathtub.

3. The Investigation

 Because Tolls was aware the Jimmy had driven appellant away after the initial
incident, Tolls and other officers went to Jimmy's house. Jimmy showed them where
appellant lived. When Tolls arrived at appellant's house at 4:42 a.m., he noticed
appellant's girlfriend's car in the driveway, despite Tolls' having instructed appellant
to leave the car at Jessica's apartment and not to return for it until the next day.

 Officer Hamilton went to the front door and knocked, while Officers Toll and
Hensley stationed themselves around the perimeter of the house to make sure that no
one left. Appellant's sister, Guadelupe, answered the door and invited the officers in. 
Tolls asked Guadelupe who owned the house, and she indicated that it belonged to her
father, Cuthberto. Guadelupe escorted Toll to Cuthberto's room. Toll woke Cuthberto
and told him that they were looking for appellant. 

 Tolls asked if he could go to appellant's room. Cuthberto responded
affirmatively and Guadelupe showed Tolls how to get to appellant's room. Tolls
turned on the light and pulled back the covers on the bed where appellant and his
girlfriend, Dora Lee Ritter, were sleeping. (1) While standing in appellant's room, Tolls
saw a shotgun on a shelf in the open closet.

 Once downstairs, appellant got dressed and was taken outside by police, where
he was handcuffed and placed in the back of a patrol car at approximately 5:30 to 6:00
a.m. Tolls called the homicide detectives, who told him to secure the scene and wait
for them to arrive.

 Homicide detective T. Miller and his partner, Sergeant Ladd, arrived at
appellant's house at approximately 7:00 a.m. He interviewed Dora, who told him that
when appellant first returned that evening, he looked like he had been in a fight. Dora
told Miller that appellant had taken his shotgun and returned, with Jimmy and Dora,
to Jessica's apartment complex. Once at the apartment complex, Dora got in her car
and left. A short time later, appellant returned home, put his shotgun in the closet, and
he and Dora went to sleep. Jimmy also gave a statement to Miller implicating
appellant.

 Miller then talked to appellant, who was sitting in the back of a patrol car. 
Miller removed appellant's handcuffs and explained appellant's statutory rights. 
Appellant agreed to waive his rights and speak with Miller about what happened. 
Miller explained that he was investigating the disturbance and following shooting at
the apartment complex. Miller asked appellant if he understood that "he was being
detained because of his involvement with that" and appellant replied, "Yes, I
understand it's for that stuff earlier."

 Miller and appellant did not discuss the facts of the situation. Instead, Miller
asked appellant if he had any evidence involved in the shooting, and appellant
responded negatively. Miller then asked appellant if he would agree to allow the
police to search his room and his parents' house. Appellant said that he would. Miller
told appellant that he would need to sign a consent form. Miller "got the consent to
search out and went over it with the defendant[,] reading it to him and making sure he
understood it while [Miller] filled it out." Miller and appellant were standing at the
trunk of the patrol car. Appellant was not in handcuffs and Miller did not have his gun
drawn. Appellant was very cooperative, and, around 7:30 to 7:45 a.m., he signed the
consent to search form. Once consent was obtained, the police search appellant's
room and recovered a shotgun and some ammunition from the top shelf of appellant's
closet.

 Miller decided to take appellant to the police station for further questioning. At
the station, Miller again read appellant his statutory rights. Appellant then gave a
statement in which he admitted that he had gone back to Jessica's apartment with a
shotgun and fired it through the door. Miller then asked appellant if he would make
a formal statement--either in written form or tape-recorded. Appellant agreed to give
a tape-recorded statement. Before taking the statement, Miller for a third time gave
appellant his statutory warnings, which appellant again waived. Appellant then gave
a tape-recorded statement admitting that he fired a shotgun through Jessica's door.

MOTION TO SUPPRESS

 In issues one and four, appellant contends that the trial court erred in denying
his motion to suppress. Specifically, he contends that he was illegally detained and
that the shotgun, shotgun shells, and his confession were the unlawful fruits of his
illegal detention, in violation of the Fourth and Fourteenth Amendments to the United
States Constitution, Article I, Section 9 of the Texas Constitution and section 14.03
of the Texas Code of Criminal Procedure.

 We begin by noting that appellant's motion to suppress was not based on
section 14.03 of the Code of Criminal Procedure, and appellant made no objection to
the admission of evidence on that basis. As such, appellant has waived his complaint
to the extent that it is based on section 14.03. See Tex. R. App. P. 33.1(a)(1)(A). We
also note that appellant does not argue or provide authority stating that the state
constitution provides greater protection than federal law. See Crittenden v. State, 899
S.W.2d 668 (Tex. Crim. App. 1995) ("Absent some significant difference in the text
of the two provisions, or some historically documented difference in attitude between
the respective drafters, there would be no apparent reason to prefer an interpretation
of Article I, § 9 any different[ly] from our preferred interpretation of the Fourth
Amendment."). Therefore, we address appellant's first point of error by conducting
a federal constitutional analysis.

1. Standard of Review

 When a motion to suppress is presented, the trial court is the sole judge of the
witnesses' credibility and the weight to be given their testimony. Guzman v. State,
955 S.W.2d 85, 89 (Tex. Crim. App. 1997). The appellate court's only role is to
decide whether the trial court improperly applied the law to the facts. Williams v.
State, 937 S.W.2d 23, 26 (Tex. App.--Houston [1st Dist.] 1996, pet. ref'd, untimely
filed). Unless the trial court clearly abused its discretion, we will not disturb its
findings. Rivera v. State, 808 S.W.2d 80, 96 (Tex. Crim. App. 1991); Williams, 937
S.W.2d at 26. Further, the appellate court affords nearly complete deference to the
trial court's rulings on "mixed questions of law and fact," such as probable cause and
reasonable suspicion, when the resolution of those questions turns on an evaluation
of credibility and demeanor. Guzman, 955 S.W.2d at 89. Accordingly, the appellate
court reviews the evidence in the light most favorable to the ruling of the trial court. 
 Id.; Taylor v. State, 945 S.W.2d 295, 297 (Tex. App.--Houston [1st Dist.] 1997, pet.
ref'd) (applying standard and reversing trial court). "In determining whether a trial
court's [suppression] decision is supported by the record, we generally consider only
evidence adduced at the suppression hearing because the ruling was based on it rather
than evidence introduced later. However, this general rule is inapplicable where, as
in this case, the suppression issue has been consensually re-litigated by the parties
during trial on the merits" Rachal v. State, 917 S.W.2d 799, 809
(Tex.Crim.App.1996) (citations omitted).

2. Detention or Arrest?

 Appellant contends that he was illegally arrested at his home when he was
detained by the officers. The State argues that nothing more than an investigative
detention occurred. Whether a detention is an investigative detention or an arrest
depends upon the facts and circumstances surrounding the detention. Amores v. State,
816 S.W.2d 407, 412 (Tex. Crim. App. 1991); Hoag v. State, 728 S.W.2d 375, 378-79
(Tex. Crim. App. 1987); Hilla v. State, 832 S.W.2d 773, 778 (Tex. App.--Houston
[1st Dist.] 1992, pet. ref'd). The reasonable use of handcuffs or the ordering of a
suspect to lie down alone does not convert an investigative detention into an arrest. 
Handcuffing alone will not necessarily convert a temporary detention into an arrest. 
See Rhodes v. State, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997); Burkes v. State,
830 S.W.2d 922, 924 (Tex. Crim. App. 1991); Hilla, 832 S.W.2d at 778. Whether an
officer believes a suspect is detained or arrested, is not determinative of the issue. 
Amores, 816 S.W.2d at 412; Hoag, 728 S.W.2d at 378; Hilla, 832 S.W.2d at 778. 
Rather, we look to the reasonableness of the officer's actions, which is to be judged
from the perspective of a reasonable officer at the scene, rather than with the
advantage of hindsight. Rhodes, 945 S.W.2d at 118. "Furthermore, allowances must
be made for the fact that officers must often make quick decisions under tense,
uncertain and rapidly changing circumstances." Id. Police may use such force as is
reasonably necessary to effect the goal of the detention: investigation, maintenance
of the status quo, or officer safety. Id. at 117. An investigative detention implies that
the obtrusive act is for the purpose of actually investigating. Burkes, 830 S.W.2d at
925. Thus, where no investigation is undertaken, the detention cannot be considered
investigatory and rises to the level of an arrest. Id.

 Appellant contends that, under Kaupp v. Texas, 586 U.S. 626, 123 S. Ct. 1843
(2003), he was arrested without probable cause when the officers entered his bedroom,
and that the subsequent search of his bedroom, seizure of shotgun and ammunition,
and statement made at the police station, were fruits of that illegal arrest. Kaupp,
while similar, is distinguishable.

 In Kaupp, the police had information that led them to believe that Kaupp was
involved in the murder of a 14-year-old girl. 586 U.S. 627-28, 123 S. Ct. At 1844. 
The police decided that they wanted to " 'get [Kaupp] in and confront him with what
[the brother] had said.'" Id. The police went to Kaupp's house and were permitted to
enter by Kaupp's father. Id. They went to Kaupp's bedroom, woke him with a
flashlight, identified themselves and said, "[W]e need to talk." Id. Kaupp said
"Okay," and the officers handcuffed him and took him to the police station wearing
only his boxer shorts and a t-shirt. Id. At the police station, after 10 to 15 minutes of
interrogation, Kaupp gave a statement admitting that he participated in the crime. Id. 
The Supreme Court held that, under these circumstances, Kaupp did not consent to go
with police, as the State alleged, but was, in fact, arrested when he was taken to the
police department for questioning. 586 U.S. at 582, 123 S. Ct. at 1847.

 In this case, the police had information that led them to believe that appellant
was involved in Priscilla's murder. As in Kaupp, they went to appellant's house and
were permitted entry, by his father and sister. And, again, as in Kaupp, the police
went to appellant's bedroom and woke him. However, here the similarity to Kaupp
ends. Appellant was permitted to get dressed. He was then handcuffed and placed in
the patrol car. The patrol officers on the scene then waited for homicide detectives to
arrive to conduct an investigation. This, we believe, is the crucial distinction between
the present case and Kaupp. In Kaupp, the police had no intention of conducting an
investigation of Kaupp's home. They intended only to take him in for questioning,
which they did without allowing him the opportunity to refuse to consent to such
questioning.

 However, in this case, the police actually conducted an investigation at
appellant's home. After homicide detectives arrived, they questioned witnesses, 
secured the scene, and obtained consents to search appellant's home. Only after the
search was conducted and the shotgun was recovered did the police decide to take
appellant and several other witnesses to the police station for further questioning.

 This case is similar to Goldberg v. State, 95 S.W.3d 345, 360 (Tex.
App.--Houston [1st Dist.] 2003, pet. ref'd). In Goldberg, the police had information
that a certain vehicle had been seen driving away from a murder scene and quickly
determined that the vehicle was registered to a person living at 2202 Dunstan. Id. at
356. Police drove to that location, found the vehicle in question, and began
questioning the maid who was in the house. Id. at 358. While the police were talking
to the maid, appellant approached. When police determined that Goldberg had had
access to the vehicle used in the murder, he was handcuffed and police read him his
rights. Id. After briefly questioning Goldberg, police asked him if he would consent
to a search of the house. Id. Goldberg agreed. Id. The police unhandcuffed
Goldberg, told him he had the right to refuse a search, and read the consent to search
form to him. Id. Goldberg signed the form and the police searched the house,
recovering several items of evidence. Id. at 359.

 This Court held that the initial handcuffing of Goldberg was not an arrest, but
an investigatory detention. The Court noted that (1) it was reasonable for police to
detain Goldberg while they completed their investigation of the scene and (2) that the
handcuffing was justified by concerns for the officers safety. Id. at 360. The Court
then analyzed whether there was reasonable suspicion to justify the investigatory
detention and whether Goldberg's consent to search was voluntarily given. Id.

 We believe that, as in Goldberg, the seizure of appellant and placing him in
handcuffs was not an arrest, but rather was a temporary detention, and was justified
by concerns for the officer' safety as well as that of the other members of appellant's
household who were present. The appellant's continued detention in the police car
was justified by the need to wait for homicide officers to arrive to conduct the
investigation.

3. Reasonable Suspicion for Investigatory Detention?

 Having decided that the appellant was the subject of an investigatory detention,
not an arrest, we must next decide whether it was based upon reasonable suspicion. 
A police officer may stop and briefly detain a person for investigative purposes if the
officer, in light of his experience, has a reasonable suspicion supported by articulable
facts that criminal activity may be afoot. Terry v. Ohio, 392 U.S. 1, 30, 88 S.Ct. 1868,
1884-85 (1968). The reasonableness of a temporary detention must be examined in
terms of the totality of the circumstances. Woods v. State, 956 S.W.2d 33, 38 (Tex.
Crim. App. 1997). A temporary detention is justified when the detaining officer has
specific, articulable facts at the time of the detention which, taken together with
rational inferences from those facts, lead him to conclude that the person detained is,
has been, or soon will be engaged in criminal activity. Id. A reasonable suspicion
means more than a mere hunch or suspicion. Davis v. State, 947 S.W.2d 240, 244
(Tex. Crim. App. 1997). A detention is not permissible unless the circumstances
objectively support a reasonable suspicion of criminal activity. Id.

 Under these circumstances, it was reasonable for to suspect that appellant was
involved in Priscilla's murder and to temporarily detain him for further investigation. 
At the time he was detained, the police had the following information:

 

 1. Appellant had been involved in a violent disturbance earlier in the
evening at 13503 Northborough, Apt. #407. In fact, appellant had
suffered minor cuts as a result of the altercation.


 2. At the time of the earlier disturbance, police noted that appellant was
drunk and belligerent


 3. Appellant would not cooperate with police during the earlier
disturbance


 4. Police did not arrest appellant or the other person involved in the
altercation. Instead, police allowed appellant to leave with a relative.


 5. As appellant left the scene of the earlier disturbance, he was taunting
the police and yelling at them.


 6. Less than an hour after appellant left the scene of the earlier
altercation, police were dispatched to a shooting at that same location. 
Upon arriving at the scene, police noticed several shotgun blasts through
the front door and a child's body being removed from the scene.

 

 7. Upon arriving at appellant's home, police noticed that appellant's
girlfriend's vehicle, which he had been instructed to leave at the
apartment complex on Northborough, was parked in the appellant's
driveway.


 We hold that the police had "specific, articulable facts" sufficient to conclude
that appellant had been engaged in criminal activity. Not even one hour earlier,
appellant had been involved in a violent altercation at the same home in which the
murder took place, and, when forced to leave by police, appellant was yelling and
taunting them. Police also knew that someone had returned to Jessica's apartment
complex to retrieve appellant's girlfriend's car. It was reasonable to suspect that
appellant had returned to the scene and had thus been involved in the shooting.

4. Voluntary Consent to Search?

 Having decided that the investigatory detention of appellant was lawful, we next
address whether he voluntarily consented to the search of his bedroom.

 A search pursuant to voluntary consent is an exception to the requirement that
a search be based upon a warrant supported by probable cause. See Reasor v. State,
12 S.W.3d 813, 817 (Tex. Crim. App. 2000). For consent to be valid, however, it must
be voluntary. Id. at 817-18. The fact that a defendant is in custody does necessarily
mean that his consent was involuntary. Id. To determine voluntariness, trial courts
"must [assess] the totality of all the surrounding circumstances--both the
characteristics of the accused and the details of the interrogation." Id. at 818 (quoting
Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041 (1973)).

 In Reasor, the defendant was arrested at gunpoint and the police illegally swept
his house for weapons. 12 S.W.3d at 815-17. Nevertheless, the court found that
appellant's subsequent consent to search was voluntary because he twice received his
statutory warnings, signed a consent to search form, and was repeatedly warned that
he had the right to remain silent. Id. at 818. The court concluded that the defendant
was aware of his rights, but, nonetheless, voluntarily chose to waive them. Id. at 819.

 Similarly, in Goldberg, the defendant, who was handcuffed, was the subject of
a lawful investigatory detention. 95 S.W.3d at 361. No weapons had been used to
effectuate his detention. Id. The police had read him his statutory rights and
explained that he had the right to refuse consent. Id. Goldberg read and signed the
consent to search form. Id. This Court held that there was nothing to indicate that 
Goldberg's "will was overborne" by oppressive police conduct. Id. (citing Jackson
v. State, 968 S.W. 2d 495, 498 (Tex. App.--Texarkana 1998, pet. ref'd) and
Schneckloth, 412 U.S. at 225-26, 93 S. Ct. at 2041.).

 In this case, as we have already determined, appellant was lawfully detained. 
No weapons were used to effectuate the detention. The police read appellant his
statutory rights and went over the consent form with him line by line (2). There is
nothing to indicate that appellant's "will was overborne" by oppressive police conduct. 
See Jackson v. State, 968 S.W.2d 495, 498 (Tex. App.--Texarkana 1998, pet. ref'd)
(citing Schneckloth, 412 U.S. at 225-26, 93 S.Ct. 2041). Accordingly, we hold that
appellant consented to the search of his bedroom.

5. Appellant's Statement at Police Station

 Appellant also complains that the statement he gave after being taken to the
police station was compelled by his illegal arrest at the time he was initially detained. 
However, because have already held that appellant's initial detention was lawful, such
detention cannot have tainted his subsequent statement. (3)

 For these reasons, we overrule points of error one and four. 

VOIR DIRE ISSUES

 In his second point of error, appellant contends that the trial court erred during
voir dire by denying his challenges for cause against veniremembers 15 and 33
because they were biased against him as a matter or law. 

 "Bias" has been defined as "an inclination toward one side of an issue rather
than to the other ... [which] leads to the natural inference that [a juror] will not or did
not act with impartiality." Anderson v. State, 633 S.W.2d 851, 853 (Tex.Crim.App.
[Panel Op.] 1982) (citing Compton v. Henrie, 364 S.W.2d 179 (Tex.1963)). Bias, by
itself, is not sufficient for a challenge for cause. See Anderson, 633 S.W.2d at 853.
Instead, an appellant must show that the juror was biased to the extent that he or she
was incapable of being fair. See id. A juror who indicates this type of bias as a matter
of law must be excused despite any protestations by the juror of an ability to set the
bias aside and be fair and impartial. See Clark v. State, 717 S.W.2d 910, 917 (Tex.
Crim. App. 1986). It is left to the discretion of the trial court to first determine
whether bias exists. Anderson, 633 S.W.2d at 854.. 

1. Juror 15

 During the voir dire of the entire panel, Juror 15, when asked whether he could
consider the full range of punishment, the following exchange took place:

 [Juror 15]: Judge, I'm leaning towards the high side. I deal with a lot of
characters in the workplace.


 [The Court]: All I'm asking you, can you consider - it just yes or not -
in an appropriate case?


 [Juror 15]: It's a qualified yes, I'm leaning towards the high side.


 [The Court]: Okay. But you could consider the full range"


 [Juror 15]: Yes.

 . . . . 


 [Prosecutor]: Well, basically I'm - let me ask that. Do you have anything
within you that would bias you, that would either make you start the State
off at a lower level and make me prove more than I need to prove? Or
the defense, would you make them - start them off at a lower level? Is
there anything or can you look at this case, judge it on its facts, be fair
and unbiased in your decision?


 [Juror 15]: I mentioned earlier that, you know, in general when people
get in scenarios like this, it's been my history dealing with police that
when they get in situations like this, it's not one instance, it's typically
a history of it. And I deal with quite a few characters that are in that
position. 


 [Prosecutor]: Yes, sir.


 [Juror 15]: And due to different employee-type of situations and
arbitrations and employee discipline, its been my experience that usually
when somebody gets in a case like that, they've got quite a bit of history
behind them, it's not an isolated instance. So I would say, in general, I
would be biased towards the prosecution.


 [Prosecutor]: Okay. Now, you know that when - if you're asked to sit on
this jury, the Judge is going to instruct you that you can't consider any of
that stuff, any prior instances, you're going to have to put that aside, at
least for the guilt part of the trial and judge the evidence you hear from
that stand and basically make me prove my case. Now, knowing that, are
you saying that basically you're not going to make me prove all that I
need to prove in order to convict someone of murder, of the offense of
murder? Because you realize, we are not talking about - this is
completely different from things you may be doing with your employees. 
Do you think you would make me prove my case?


 [Juror 15]: Yeah, you would have to prove it.


 [Prosecutor]: And then, I guess, a follow-up question to that is: If I did
prove my case to you, can you, as you sit here for the offense of murder,
consider the full range of punishment?


 [Juror 15]: I can consider the full range, but I will be biased towards the
high end.


 [Prosecutor]: But at this point, as you sit, because we're not - I'm not
asking you to give probation in this case. I'm not asking you can you
give probation, I'm just asking you in your mind, can you consider, as
you sit here, the full range of punishment, which means probation to life? 
After you get in a position and you hear other evidence, there may be
evidence, there may be not; but you hear it, then if you think life is
appropriate, you know, you give life. If you think 60 years is
appropriate, you give 60 years. If you think probation is appropriate in
this case, then you give probation. Can you do that?


 [Juror 15]: Yes.


At the bench, away from the other veniremembers, the following exchange took place 


with Juror 15.


 [The Court]: Okay. No. 15, once and for all, we've asked you 50
different ways the same thing, but can you be fair in this case or are you
so biased towards the State that you can't?


 [Juror 15]: I think people need to be held accountable for their actions.


 [The Court]: And that is what the court of law is about, holding people
to account as long as the State can prove it. You just can't hold people
accountable for something they didn't do.


 [Juror 15]: I agree.


 [The Court]: Okay. So we don't want you to be such, the kind of person
that you're so interested finding people accountable that you would find
him guilty for less than what the law requires. So can you, or can't you?


 [Juror 15]: Can I or can't I?


 [The Court]: Follow the law and make the State prove their case beyond
a reasonable doubt and no less?


 [Juror 15]: I know I can follow the law.


 [The Court]: Will you?


 [Juror 15]: Yes.


2. Juror 33


 During the voir dire of the entire panel, the following exchange took place with
Juror 33:

 [Prosecutor]: Do you think that if the Judge instructed you, you know, to
follow the law - she is going to give you the law, she's going to ask you
to follow it. Do you think if she does that, that you can follow the law
that she gives you and judge this case and give Mr. Trujillo basically the
same chance or the same shot that you would want if you were in his
position, and judge the facts on what you hear from that stand, and judge
the evidence that I bring forth? Now that doesn't mean that after - if I do
prove my case to you and you do find him guilty that you can't you know
- fair to you may be different that fair to somebody else. So when I ask
you if you can be fair, do you think that you can be fair and give him the
same shot that you would want if you were sitting in his spot?


 [Juror 33]: Yes. I explained to the Judge, I guess we are all - you know,
we have the benefit of all our experiences throughout life and it makes
us be the person that we are; but I come from a very rule-oriented
profession, being a CPA, and I go by the rules. And I think I can set it
aside and apply the rules that fit in this particular case.


 [Prosecutor]: Are you going to make me prove my case?


 [Juror 33]: Yes.


 [Prosecutor]: Are you going to hold me to any - are you going to start me
off ahead of [defense counsel] here?


 [Juror 33]: No.


At the bench, away from the other veniremembers, the following exchange took place
with Juror 33.


 [The Court]: This is the one time when you're not a lawyer you get to go
behind. Look, we've done a lot of conversations when I started with you
and then through the two lawyers. So here's the bottom line, you're an
intelligent man. Can you be fair and unbiased in this case or are your
[sic] leaning one way or the other?


 [Juror 33]: Well, I'll try to be as fair and unbiased as I can.


 [The Court]: Nobody wants to say they're unfair, but I'm just asking you
if you - leaning I think you said.


 [Juror 33]: I did. I really had some bad experiences with criminals in our
life with theft and this sort of thing. And as I said, I'm a fairly rules-oriented person and I tend to look at things fairly black and white. And
I guess the older I've gotten, probably the less patience I have with
certain things. And I'll try to be as unbiased as I can, but I probably
have, like the gentleman said, probably a certain amount of bias that I
kind of just - it's kid of built into my personality.


 [The Court]: Bias towards - against the State, against the defense.


 [Juror 33]: No, against the defendant. I'm pretty much of law-and-order
kind of person, I guess, from that background.


 [The Court]: Well, we all are.


 [Juror 33]: Yeah; but, you know, I feel like rules are rules and ought to
be enforced.


 [The Court]: Even [defense counsel] is kind of a law-and-order kind of
person.


 [Juror 33]: I'm sure he is.


 [The Prosecutor]: Can I follow up on that? The Judge is going to give
you all the law in this case and even if you might not agree with it or you
dislike it, will you still follow it?


 [Juror 33]: Yes.


 [The Court]: Well, what's your concern about your bias and how would
you ever think that your bias might come into play because, you know,
you have to follow the law in regards to a case. The maybe you don't
know -


 [Juror 33]: Well, you know, I guess it's - I haven't given this a great deal
of thought. I haven't dwell [sic] on it a lot, but I feel like people that
break the law need to be punished. And a little bit like the gentleman
was having a discussion with you about, alcoholism, not be an excused
- I know those are the wrong words - I kind of feel sort of the same way,
that, you know, we're responsible for our own actions.


 [The Court]: But that's the law. If you find - I guess, you know, what
everybody wants to be comfortable about is that you're not leaning one
way of the other when you start because the law - you already know what
the law is, I've been talking to you about it for almost four hours.


 [Juror 33]: Right.


 [The Court]: And I know you've been listening. So there's a
presumption of innocence, the State has the burden of proof and you have
to follow that, if you can. If you experiences in past are such that you
can't, just tell us. You're the only one who knows.


 [Juror 33]: I think I can, I think I can follow the law. That's what I've
been doing for 43 years and practicing, you know accounting.

 . . . .


 [Defense counsel]: Thank you. With respect to the punishment issue, if
a person were convicted of murder - and we've talked about there's all
kinds of different ways?


 [Juror 33]: Sure.


 [Defense counsel]: Can you consider the full range of punishment from
five years probation all the way to 99 years or life?


 [Juror 33]: Yeah. I'm a little bit like the other gentleman who talk [sic]
about probations, I just - you read all these things where the jury thinks
they gave one verdict and found out later and then something else comes
into play that nobody know about and they end up getting half of what
the jury thought they were getting, those kinds of things. Those kinds of
things bother me, but generally I can go from the full range, either end.


3. Analysis


 As detailed above, the trial court conducted extensive questioning of Jurors 15
and 33 to determined whether they were biased, i.e., whether they were incapable of
being fair. Despite Juror 15's remarks that people need to be held "accountable for
their actions" and Juror 33's remarks that he was a "law-and-order kind of person,"
both were able to assure the trial court that they could, in fact, follow the law. 
Accordingly, we hold that the trial court did not abuse its discretion in determining
that Jurors 15 and 33 were not biased as a matter of law. See Cordova v. State, 733
S.W.2d 175, 182-84 (Tex.Cr.App.1987) (statements by one venireperson that "he
wanted to fry the guy" and by another venireperson that defendant should be punished
according to the Biblical adage "an eye for an eye, a tooth for a tooth" did not
necessarily disqualify the venirepersons, absent a showing that they could not follow
the law as given them by the trial court).

 We overrule point of error two.

ADMISSION OF AUTOPSY PHOTOGRAPHS

 Appellant contends that the trial court erred in overruling his objections to the
admission of several autopsy photographs of Priscilla. Specifically, appellant argues
that the photographs should have been excluded under Rule 403 of the Rules of
Evidence because their probative value was substantially outweighed by the danger
of unfair prejudice. See Tex.R. Evid.403. When the trial court rules on a rule 403
objection, we review the court's ruling under an abuse of discretion standard. State
v. Mechler, 153 S.W.3d 435, 439 (Tex. Crim. App. 2005). The test for whether the
trial court abused its discretion is whether the action was arbitrary or unreasonable. Id.
We will not reverse a trial court's ruling that is within the zone of reasonable
disagreement. Id. at 440. In determining whether the probative value of evidence is
substantially outweighed by the danger of unfair prejudice, a court should consider (1)
the probative value of the evidence, (2) the potential to impress the jury in some
irrational, yet indelible, way; (3) the time needed to develop the evidence, and (4) the
proponent's need for the evidence. Erazo v. State, 144 S.W.3d 487, 489 (Tex. Crim.
App. 2004).

 In determining the prejudicial effect of photographs, courts may consider the
number of photographs offered; their gruesomeness, detail, and size; whether they are
in color; whether they are taken close-up; whether the person in the photograph is
clothed; and any other factors unique to the situation. Shuffield v. State, 189 S.W.3d
782, 787 (Tex. Crim. App. 2006); Long v. State, 823 S.W.2d 259, 270 (Tex. Crim.
App. 1991). Autopsy photographs are generally admissible unless they depict
mutilation caused by the autopsy itself. Salazar v. State, 38 S.W.3d 141, 151 (Tex.
Crim. App. 2001). When photographs depict internal organs that have been removed
to portray the extent of the injury to the organs themselves, the photographs are not
considered to be depictions of mutilation of the victim by autopsy. Salazar v. State,
38 S.W.3d 141, 151-52 (Tex . Crim. App. 2001). Furthermore, photographs depicting
mutilation by the medical examiner may be admissible when the photographs show
bruising or other damage that is attributable to the defendant's actions but is not
visible externally, thereby making the photographs highly relevant to the manner of
death. See Ripowski v. State, 61 S.W.3d 378, 392-93 (Tex. Crim. App. 2001).
Alterations caused by the autopsy are "of minor significance if the disturbing nature
of the photograph is primarily due to the injuries caused by the appellant." Hayes v.
State, 85 S.W.3d 809, 816 (Tex. Crim. App. 2002). Overall, the photograph must be
helpful to the jury: "If there are elements of a photograph that are genuinely helpful
to the jury in making its decision, the photograph is inadmissible only if the emotional
and prejudicial aspects substantially outweigh the helpful aspects." Erazo, 144
S.W.3d at 491-92.

 At issue in the case are four autopsy photographs. Exhibits 100, 101, and 102
show different angles of Priscilla's skull with the scalp reflected back. All three show
the severe hemorrhaging caused by the shotgun pellets that penetrated Priscilla's scalp. 
Exhibit 104 is a picture of Priscilla's skull after the blood had been cleaned off and
shows where several shotgun pellets penetrated her skull. The photographs are small,
in color, and it took very little time to develop the evidence.

 As part of its case, the State had to prove that Priscilla was shot by a firearm and
that her death was caused by that shot. Appellant argues that the photographs could
not have been helpful to the jury because he did not dispute the severity of the injuries
or the cause of Priscilla's death. However, a defendant need not dispute the severity
of the injuries or the cause of death to make photographs probative. Holford v. State,
177 S.W.3d 454, 464 (Tex. App.--Houston [1st Dist.] 2005, pet. ref'd). 

 Appellant also argues that the photographs were unnecessary because other
autopsy photographs, which showed Priscilla's shaved, but intact scalp, had already
been admitted into evidence. The State, however, argues that the photographs with
the scalp reflected back were necessary to show the massive hemorrhaging caused by
the shotgun. We agree that the extent of Priscilla's injuries is not readily apparent
from the photographs in which the scalp was left intact. Those photographs show only
tiny black spots where the pellets penetrated Priscilla's scalp. In contrast, the
photographs at issue show that the tiny pellets caused a massive amount of bleeding
under the scalp, which led to Priscilla's death. The disturbing nature of the
photographs comes from the amount of damage inflicted by the shotgun pellets, not
the alterations to the body by the autopsy. See Hayes, 85 S.W.3d at 816. Furthermore,
the photographs showed internal bleeding caused by appellant's action that was not
otherwise apparent. See Ripowski, 61 S.W.3d at 392-93.

 Accordingly, we hold that the trial court did not abuse its discretion by
overruling appellant's objections to the admission of the autopsy photographs.

 We overrule point of error three.



CONCLUSION

 We affirm the judgment.


 

 Sherry Radack

 Chief Justice


Panel consists of Chief Justice Radack and Justices Alcala and Bland.


Do not publish. Tex. R. App. P. 47.2(b).
1. ' ' ' 
 
 
 
2. 
 
 
 
 
 
 
 
3. 
 
 
 
 
 
 
 
 ' '